**FOR PUBLICATION**

# JUDICIAL COUNCIL
# OF THE NINTH CIRCUIT

IN APPROVAL OF THE JUDICIAL
EMERGENCY DECLARED IN THE                    ORDER
DISTRICT OF ARIZONA

Filed March 2, 2011

Before: Alex Kozinski, Chief Judge, Procter Hug, Jr.,
Sidney R. Thomas, Raymond C. Fisher, Ronald M. Gould,
and Johnnie B. Rawlinson, Circuit Judges,
Audrey B. Collins, Roger L. Hunt, James Ware,
Chief District Judges, and Stephen M. McNamee and
Robert H. Whaley, District Judges.

## ORDER

On January 20, 2011, Chief Judge Roslyn Silver declared
a thirty day judicial emergency in the District of Arizona pur-
suant to 18 U.S.C. § 3174(e). Finding no reasonably available
remedy, the Judicial Council agreed to continue the judicial
emergency for an additional one-year period and suspend the
time limits of 18 U.S.C. § 3161(c). The continued judicial
emergency will end on February 19, 2012.

The attached *Report by the Judicial Council of the Ninth
Circuit Regarding a Judicial Emergency in the District of Ari-
zona* constitutes the findings of fact and conclusions of law of
the Judicial Council justifying a declaration of judicial emer-
gency pursuant to 18 U.S.C. § 3174. This report was submit-
ted to the Director of the Administrative Office of the U.S.
Courts. *See* 18 U.S.C. § 3174(d).

## REPORT OF THE JUDICIAL COUNCIL OF THE NINTH CIRCUIT REGARDING A JUDICIAL EMERGENCY IN THE DISTRICT OF ARIZONA

### Submitted to the Administrative Office of the U.S. Courts Pursuant to 18 U.S.C. § 3174(d)(1) March 2, 2011

On November 24, 2010, the late Chief District Judge John Roll initiated the process to declare a judicial emergency in the District of Arizona under 18 U.S.C. § 3174. He reported a crushing criminal caseload and inadequate judicial resources, and sought the Ninth Circuit Judicial Council's approval in declaring an emergency that would suspend the time limits of the Speedy Trial Act (STA) for bringing accused criminals to trial. This request is virtually unprecedented: only two circuit courts have approved a judicial emergency under 18 U.S.C. § 3174(e) since the Speedy Trial Act was enacted, both occurring over 30 years ago.

With existing circumstances already dire, the tragic death of Judge Roll on January 8, 2011, caused Chief District Judge Roslyn Silver to declare a judicial emergency under 18 U.S.C. § 3174(e). This judicial emergency period commenced on January 20, 2011 and ended February 19, 2011. Chief District Judge Silver sought the Judicial Council's approval to extend the suspension of time limits for one year pursuant to 18 U.S.C. § 3174(b). After gathering additional data, and engaging in extensive discussion about the extraordinary circumstances, the Judicial Council found no reasonably available remedy, and thus agreed to declare a judicial emergency and suspend the time limits required by 18 U.S.C. § 3161(c) for one year. The continued judicial emergency commenced on February 20, 2011, and will conclude on February 19, 2012.

Under 18 U.S.C. § 3174(d), the Judicial Council hereby submits to the Administrative Office: (1) the District of Arizona's application for a declaration of a judicial emergency,

(2) a written report stating in detail the reasons for granting the application, and (3) a proposal for alleviating congestion in the district.

## I.   A Judicial Emergency Exists in the District of Arizona

### A.   *18 U.S.C. § 3174: the Judicial Emergency Provision*

According to 18 U.S.C. § 3174(a), upon application by the district, the judicial council "shall evaluate the capabilities of the district, the availability of visiting judges from within and without the circuit, and make any recommendations it deems appropriate to alleviate calendar congestion resulting from the lack of resources." If a judicial council finds no reasonably available remedy, it may declare a judicial emergency and suspend the 70-day time limit for a period up to one year, instead allowing up to 180 days before a trial must commence. *See* 18 U.S.C. § 3174(b). The time limits to try detained persons "who are being detained solely because they are awaiting trial" are not affected by the emergency provision. *Id.* If the time limits are not suspended, the sanction for not bringing a defendant to trial within 70 days of the filing of the indictment is a dismissal of the indictment. *See* 18 U.S.C. § 3162(a)(2).

The statute does not specify what qualifies as an emergency or what factors to assess before determining that there is "no reasonably available remedy." In the legislative history of the Speedy Trial Act, many members of Congress commented on the importance of a court's resources to be able to comply with the Act's time limits, and the ability to suspend time limits if a court could not meet those requirements. *See* 120 Cong. Rec. 41,773, 41,775 (1974). The legislative history supports that an emergency situation would include the death or incapacity of a judge. *Id.*

Congress did not intend that a district court demonstrate its inability to comply with the STA by dismissing criminal cases

and releasing would-be convicted criminals into society. *See* H.R. Rep. No. 93-1508 at 80-82, *reprinted in* 1974 U.S.C.C.A.N. 7401. In fact, the emergency provision has been used twice previously to avoid imminent criminal dismissals as a sanction for non-compliance. *See United States v. Bilsky*, 664 F.2d 613, 619-20 (6th Cir. 1981) (Sixth Circuit suspended time limits for one year in the Western District of Tennessee shortly after the Speedy Trial Act became effective in 1980); *United States v. Rodriguez-Restrepo*, 680 F.2d 920, 921 at n.1 (2d Cir. 1982) (Second Circuit approved emergency for the Eastern District of New York, noting the district's "burgeoning caseload and calendar congestion.").

In addition to the statutory judicial emergency, as outlined above, the District of Arizona also has a "judicial emergency" as defined by Judicial Conference policy. A vacancy on a district court is considered an "emergency" if the court's "weighted filings" exceed 600 per judgeship. The District of Arizona's weighted filings, 653 per judgeship, are high enough that Judge Roll's judgeship became a judicial emergency immediately upon his January 8 murder. *See* Russell Wheeler and Sarah Binder, *Do Judicial Emergencies Matter? Nomination and Confirmation Delay during the 111th Congress*. The Brookings Institute, Feb. 16, 2011, at 1, *available at* http://www.brookings.edu/papers/2011/0216_judicial_emergencies_wheeler_binder.aspx.

B.  *The District of Arizona's Application*

The District of Arizona's application includes the late Chief District Judge Roll's letter dated November 24, 2010, Chief Judge Silver's letter dated January 25, 2011, and Chief Judge Silver's Declaration of a Judicial Emergency in General Order No. 11-02. *See* Tabs A-C. In his letter, Judge Roll reported that the District of Arizona has the sixth-highest weighted and the third-highest un-weighted caseload in the nation. In Fiscal Year (FY) 2009, the District of Arizona ranked first in the

Ninth Circuit and third in the nation in criminal case and defendant filings, an increase of 65% since 2008.

This increase particularly affects the Tucson division. In his November 24, 2010 letter, Judge Roll explained that the then four active judges and one senior district judge in Tucson were scheduled at that time to hear 919 trials, including 893 jury trials, 73% of which involve either immigration or drug charges. *See* Tab A at pp. 2-3. It has been the practice of the Tucson judges to set 30 cases for jury trial each Tuesday, but the district judges cannot preside over more than two trials per week. Clearly, that schedule is premised on the likelihood that most cases will plead out, or defendants will agree to a continuance. Now, with Judge Roll's death, resulting in two vacancies on the Tucson bench, the situation has become intolerable.

As further described by Chief Judge Silver, since the death of Judge Roll, the three remaining Tucson judges are facing over 1,000 felony cases each. *See* Tab B at p. 1. Judge Roll's death raised the number of vacancies in the District of Arizona to three, with a vacancy created in Tucson when District Judge Zapata took senior status, and another created in Phoenix when Judge Murguia was elevated to the Ninth Circuit Court of Appeals. *Id.* At this time, there are no nominees for these three vacancies.

## II.   Reasons for Granting the District of Arizona's Application

The District of Arizona's application sets forth the reasons why a judicial emergency exists in Arizona. The data detailed below shows that the District of Arizona has calendar congestion because of an inordinate amount of criminal cases, criminal defendants, and a lack of judicial resources.

A.  *Current Caseload Status of the District of Arizona*

1.  Criminal Docket

In FY 2009, the District of Arizona ranked first in the Ninth Circuit and third in the nation for criminal case filings. The national average of criminal felony filings per judgeship was 97 during FY 2009. During this same period, each Arizona district judge averaged 328 criminal felony filings, but in the Tucson Division, this number was 652 filings per judge. The picture becomes bleaker when one looks at the number of criminal defendants, not just the number of cases. In Arizona, there have been 6,922 criminal defendants (4,913 were in Tucson) during Calendar Year 2010, a 33.9% increase over the previous year. We incorporate by reference the numbers for FY 2008 through FY 2010 for felony case filings, felony defendant filings, felony case sentencings, and felony defendant sentencings as listed in Judge Roll's November 24, 2010, letter. *See* Tab A at pp. 3-4.

Since Judge Roll's criminal caseload has now been distributed among the three active district judges in Tucson, their caseloads are even more staggering. As of January 31, 2011: Judge Collins had 972 criminal cases, and 1,218 criminal defendants; Judge Jorgenson had 1,005 criminal cases, and 1,222 criminal defendants; and Judge Bury had 963 criminal cases, and 1,182 criminal defendants. If filings continue at the same pace as the past 12 months, the active judges will receive an average of 1,548 criminal defendants in Calendar Year 2011.

The District of Arizona's magistrate judges are overburdened as well. In FY 2009, its magistrate judges heard 20,952 petty offense cases — second highest in the nation, the first being the Southern District of Texas. Most of the petty offense cases were heard in Tucson (over 17,000). In addition, magistrate judges in Arizona heard 1,016 Class A misdemea-

nor cases — second highest in the nation, out of a total of 8,700 such cases nationwide.

## 2.   Civil Docket

The District of Arizona is also experiencing inordinate pressure with its civil caseload. Three percent of civil cases filed in Phoenix, and 5.6% of the Tucson cases, have been pending over 3 years as of December 31, 2010, a total of 3.4% for the district. Of the motions filed in this district, 10.6% were pending over 6 months as of January 18, 2011. Because of the overwhelming caseload, in FY 2009, Arizona ranked an unenviable 54th in the nation and 6th in the circuit for time from filing to trial in civil cases, and 35th in the nation and 7th in the circuit in time to disposition.

These percentages demonstrate the pressure of the civil caseload and motion docket at all times. Given that these numbers were generated when the District of Arizona had no vacancies, and now there are three vacancies with no nominees, the backlog will continue to grow. We note that Circuit Judge Tashima graciously volunteered to take on Judge Roll's civil docket, which will help the District of Arizona's overburdened district judges.

## 3.   Capital Docket

The District of Arizona has a large number of inmates on death row. Currently, there are 135 individuals on death row, virtually all of whom will file petitions for a writ of habeas corpus in the federal district court. These cases consume an enormous amount of judicial and staff resources. Within the Ninth Circuit, only California has a higher number of death row inmates. The District of Arizona has also had a large number of federal death penalty cases prosecuted; 13 cases involving 32 defendants eligible for the death penalty have been filed since 1999.

### 4.    Overall Caseload

In FY 2009, Arizona carried a weighted caseload of 603, and an unweighted caseload of 860 cases per active district judge (which was third highest in the nation). In FY 2010, Arizona's weighted caseload was 653, ranking ninth highest in the nation (the unweighted caseload data is not yet available). The higher ranking districts include districts in other border states or districts with multi-district litigations (MDLs).

### B.    *Border Patrol Program and USAO Resources*

The District of Arizona's criminal caseload has grown because the Department of Homeland Security has increased border enforcement, and the United States Attorney's Office has increased its efforts to prosecute these cases along the United States-Mexico border. *See* Tab D: Administrative Office of the United States Courts: *Report on the Impact on the Judiciary of Law Enforcement Activities along the Southwest Border*, prepared for the U.S. House of Representatives and Senate Committees on Appropriations (July 2008) ("AO Report"). *Operation Streamline*, a program that requires criminal prosecution and imprisonment of all individuals unlawfully crossing the border, eliminated the discretion traditionally reserved by United States Attorney's offices to limit prosecution to immigrants with criminal records or previous illegal border-crossings. *Id.* at pp. 1-7. This program has led to a burgeoning number of federal criminal prosecutions in all districts bordering Mexico, but the increase has been particularly pronounced in the District of Arizona.

In the few years since *Operation Streamline* commenced, the United States Attorney's Office in Tucson has doubled its number of prosecutors and empaneled a third grand jury in January 2011. The United States Attorney's Office for the District of Arizona reports that it added 42 AUSAs since 2006, and filled eight other AUSA vacant positions. *See* Tab

E: United States Attorney District of Arizona "Border Security Fact Sheet June 2010." There are currently 170 AUSAs in the District of Arizona, a 62% increase over the past 10 years. *See* http://www.justice.gov/usao/az/office_overview.html.

There has also been a dramatic increase in the number of U.S. Border Patrol and other federal law enforcement agents in Arizona. *Id.* In FY 2009, the Border Patrol apprehended approximately 241,000 people in the Tucson Sector and seized well over 1 million pounds of marijuana. Due to this dramatic increase in resources, the USAO was able to investigate and prosecute 3,200 felony and 22,000 misdemeanor illegal immigration cases in FY 2009, in addition to prosecuting other border-related crimes involving drug and firearms smuggling. *Id.* at p. 1.

All *Operation Streamline* cases resulting from Border Patrol apprehensions in the Tucson Sector (comprised of 262 miles of international border, extending from the Arizona border with New Mexico to the Yuma County line) are heard at the Evo A. DeConcini Federal Courthouse in Tucson. The 2008 AO Report deemed this area the "the busiest sector along the entire border." *See* Tab D: AO Report at p. 6. Presently, Tucson division magistrate judges hear 70 *Operation Streamline* cases per workday. During Calendar Year 2010, the Tucson Division disposed of 20,066 immigration petty offense cases, of which 16,981 were part of *Operation Streamline*.

In fact, the Department of Justice asked for a funding increase of $231.6 million for FY 2010 to support its immigration enforcement along the southwest border, including *Operation Streamline*. The DOJ request includes $8.1 million to fund new USAO positions in response to the rising caseload along the U.S.-Mexico border. *See* U.S. Department of Justice, Fiscal Year 2010 Budget Request (2009), *available at* http://www.usdoj.gov/jmd/2010factsheets/pdf/safeguardingour-swb.pdf. According to

the 2008 AO Report, an additional $100 million was appropriated in FY 2008 to the Department of Justice, including $7 million to hire additional AUSAs and support staff, and in FY 2009, the Department of Justice requested $100 million in new funding for the Administration's Southwest Border Enforcement Initiative, including $8.4 million to hire another 50 AUSAs along the border. *See* Tab D, AO Report at p. 8.

There has been no correlating increase in Article III judgeships, and as noted above, there is a further significant decrease in judicial resources with the three current vacancies.

## III.   Proposal for Alleviating Congestion

### A.   *Visiting Judges*

The Ninth Circuit maintains a robust and vigorous visiting judge program that provides visiting judges to districts requiring assistance each year. In the past, the Circuit has successfully addressed the lack of judicial resources in districts throughout the Ninth Circuit, including the Southern District of California, the Central District of California, the District of Montana, the District of Idaho, and the District of Arizona. Most recently, the Circuit recruited more than 80 visiting judges to assist the Eastern District of California, which the individual judges assuming between 15 and several hundred cases, resulting in nearly 900 case terminations to date.

The District of Arizona has been employing visiting judges to the fullest extent possible. As of this writing, 36 judges from within and outside the Ninth Circuit have been designated to assist the court in 2011, serving one-to-four-week tours in the district. In addition, judges from Alaska and the Eastern District of Washington have provided ongoing and long-term assistance to the District of Arizona. With the assistance of the U.S. Judicial Conference Committee on Intercircuit Assignments, additional visiting judges will continue to be recruited from all across the country for the foreseeable

future or until the District receives the additional judicial resources it so desperately needs.

The Phoenix division is limited in the help it can provide to the Tucson division because it handles a disproportionate percentage of the district's civil filings, in addition to approximately one-third of the district's felony cases.

The District of Arizona and the Judicial Council are jointly developing a plan to use visiting judge resources in the most effective manner as possible. However, as will be discussed in more detail, the physical limitations of the courtroom space in Tucson and the necessity of scheduling 30 trials each week severely constrain the ability of the Circuit to provide sufficient visiting judge assistance that will address the criminal docket in Tucson. The District has already adopted an effective case management system, so no further efficiencies can be achieved through any change in court administrative procedure.

B.   *Courthouse Facilities*

Visiting judges are not an adequate short-term fix, nor are they a long-term solution to this problem. *See* Tab D, AO Report at p. 10. The Evo A. DeConcini United States Courthouse in Tucson has only been able to accommodate one visiting judge at a time, and now can accommodate two with Judge Roll's courtroom available. The Special Proceedings Courtroom is unavailable because it is completely utilized for *Operation Streamline* proceedings. There are only two other courtrooms not assigned to a judge, one of which is needed each day for felony criminal duty (detention hearings in the morning and initial appearances in the afternoon). Once per week another district judge sized courtroom is needed for arraignments. The magistrate judges typically use their assigned courtrooms both mornings and afternoons each day for felony change of plea and other proceedings. Thus, the visiting judges can only be scheduled to courtrooms as they

become available each day. Any visiting judge presiding in a civil trial will likely have to do so in courtrooms borrowed from the bankruptcy court at the Walsh Courthouse down the street.

On September 29, 2010, Judge Roll submitted a statement to Congress concerning the space problems at the Evo A. DeConcini district courthouse. *See* Tab F: *Testimony re: Evo A. DeConcini Courthouse in Tucson Division: Hearing before the Subcommittee on Courts and Policy of the House Judiciary Committee*, 111th Cong. (2010) (statement of Chief Judge John Roll). In those comments, Judge Roll responded to a GAO Report stating: "No one familiar with the actual situation in Tucson could reasonably conclude that the DeConcini Courthouse was overbuilt in 2000 or that the Courthouse has any extra available space. In fact, there is a constant search for tenants who will leave the Courthouse to free up additional space." *Id.* at p. 9. The GAO's position that the Tucson Division did not need more space had assumed courtroom sharing, which isn't practical in busy border state courts, and also didn't take into account the frequent use of visiting judges. As noted in the 2008 AO Report, the District of Arizona had inadequate facilities for court operations, and Tucson's criminal case filings increased "well beyond the volume projected" when the courthouse was designed. *See* Tab D: AO Report at pp. 11, 21-22 (noting "serious space limitations.").

Congresswoman Gabrielle Giffords continues to champion the District of Arizona's space crises. In a letter written February 7, 2011, Congresswoman Giffords' Chief of Staff wrote to the Chairmen of the Committee on Appropriations and the Subcommittee on Financial Service and General Government requesting that GSA work with the DeConcini courthouse tenants to lease auxiliary space. *See* Tab G: Letter from Pia Carusone, Congresswoman Giffords' Chief of Staff, (misdated February 7, 2010). Because the courthouse is out of space, and the United States Attorney's Office lease in the DeCon-

cini Courthouse doesn't expire until 2013, the judiciary would have to spend an inordinate amount of money to relocate them pursuant to 41 C.F.R. § 102-85.210.

### C.   *Other Methods to Expedite Cases*

While it awaits the judicial resources it needs, the District of Arizona, with the help of this Judicial Council, will employ whatever techniques, innovations, and other methods it can to expedite cases. One such idea that the District of Arizona is currently evaluating is an offer from the Ninth Circuit's Office of the Circuit Mediator for its team of mediators to help with the caseload burden.

The mediators would help with only civil cases, and only those in which both parties are represented by counsel. Once the district and the Circuit Mediation Office are able to consider and work through the logistics, mediators could travel to Arizona to conduct mediations in cases that would normally have been conducted by a magistrate judge, thereby freeing up some time for the District of Arizona's magistrate judges to focus on their caseload. Further, if this option becomes available, the district judges may suggest mediation to civil parties in cases not traditionally referred to mediation.

### D.   *Additional Resources Needed to Comply with the STA*

The District of Arizona's congestion may be alleviated in the long term only if its vacancies are filled and new judgeships created. This district does not have the resources to keep pace with the current prosecution of border-related cases.

#### 1.   Judgeships and Filling Vacancies

The Committee on Judicial Resources of the Judicial Conference of the United States recently recommended that the District of Arizona be authorized five additional judgeships (four permanent and one temporary). *See* Tab H: JCUS

Report dated January 10, 2011 at pp. 5-6. The Committee also recommended converting a current temporary position to permanent status. The Federal Judgeships Act was introduced in the last Congress (S. 1653 and H.R. 3662) but no action was taken on the proposed legislation. No judgeships bills have been introduced yet in the 112th Congress.

Arizona's congressional delegation is well aware of the district's crisis: Judge Roll kept the delegation apprised about increased case filings and judgeship needs, and House Representatives Gabrielle Giffords and Ed Pastor recently wrote a joint letter acknowledging the crisis and supporting the District of Arizona's request for the suspension of Speedy Trial Act time limits. *See* Tab I: Giffords and Pastor letter dated December 21, 2010. Indeed, Judge Roll went to Representative Giffords' "Congress on Your Corner" on January 8, 2011, to discuss this very topic. Judge Roll also advised, on December 10, 2010, that Senators John McCain and Jon Kyl also supported the district's request for a judicial emergency.

The District of Arizona must await Congress to create the recommended judgeships, fill vacancies, and provide other resources. In fact, then Representative Abner Mikva, a sponsor of the Speedy Trial Act, recognized that Congress was responsible to ensure that courts were adequately staffed if it was to impose the Speedy Trial Act time limits. He acknowledged the need to allow for postponement of the Act's requirements if a court had inadequate resources. He wrote in a prepared statement in 1971:

> Nevertheless, it may well be that even if all the judges in a given circuit were putting in a full week's work on the bench, and even if the most modern, efficient administrative techniques were employed, we would still find that the available resources are inadequate to achieve the goal of speedy and fair trials.

In this event, Section 3164 allows for a postponement of the speedy trial requirements of Section 3161. The (Judicial Conference) is required to submit legislation to Congress providing the needed additional resources. This places the burden back where it belongs — on the shoulders of Congress. It will then be up to the representatives of the taxpayers of America to decide whether we are serious enough about crime prevention to expend the money and effort necessary to obtain it. In other words, the buck will stop here.

*See* TAB J at p. 261.

The 2008 AO Report suggested to the Senate and House Appropriations Committees that additional judgeships were needed, and that there had been a lag in the appropriations process, "in that prosecution resources have been provided to the Executive Branch without considering at the same time the impact that these additional resources will have on the Judiciary." *See* Tab D, AO Report at p. 17.

Swiftly filling the three current vacancies in the District of Arizona will help, but please recall that only one of these vacancies existed when Judge Roll reported the crisis in November 2010. Thus, consideration should be given to proposing legislation to create the additional judgeships that the District of Arizona so desperately needs.

### 2.   Other Needed Resources

The Clerk's Office staffing is based in large part on the number of judgeships authorized for a district court. The number of visiting judges assigned to the court will also increase the need for additional Clerk's Office staff, as will the enormous number of border-related cases, and reassignments due to Judge Roll's death. We are working with the Clerk of Court in the District of Arizona to identify its requirements, but note at this time the following units are particularly strained:

(a) Docketing and Calendar Clerks: Tucson's calendar clerk is working overtime to keep up with processing all the motions to continue criminal sentencings and trials. In January, she processed 1,166 continuances (32% more than January 2010). The criminal sentencings, disposition hearings, and trials set for Judge Roll are being rescheduled before visiting judges. The district is currently moving sentencings from the other three active judges to visiting judges. There are over 1,100 proceedings that need to be rescheduled, with noticing given to U.S. Marshals, Probation, and the attorneys. Further, during 2010 alone, the clerk's office processed over 2 million dollars in CJA vouchers related to *Operation Streamline*.

(b) Interpreters: The seven staff interpreters are in court every day, most of the certified contract interpreters in Tucson are called in most days, and TIP (Telephone Interpreting Program) proceedings take place each day. Any increase in criminal court activity requiring interpreters will strain the system and court could be delayed until interpreters become available. An administrative clerk was recently hired to log letters/documents submitted for translation and assist with the headsets during *Operation Streamline* proceedings which reduced the staff interpreters' burden.

(c) Probation Office: This office's staffing is based primarily on the number of pre- and post-conviction sentencing reports and the number of post-supervision cases supervised in the community. The crushing criminal workload is taking a severe toll on staff. Although the Administrative Office has provided the Probation Office with supplementary funds, funding remains insufficient to hire enough probation officers to support the work of judicial officers. There are 262 on-board employees, another 16 officers will be hired. The expected staff size of 278 will still be 21 positions fewer than what is needed. The increase in cases also presents a need to increase video teleconferencing capacity with the detention facility where defendants are held.

(d) Pretrial Services: This office's staffing is based primarily on case activations (new investigations) and defendants under supervision. Between fiscal years 2009 and 2010, there was a 40% increase in case actions, growing from 13,145 to 18,424. This is primarily due to the increase in Operation Streamline prosecutions. Additionally, there was a 22% increase in cases received for supervision during that same time period, growing from 908 cases to 1,109. Workload continues to increase and it has been difficult to keep pace with staffing. Although recent hires will help alleviate some of the tremendous workload strain on staff, if workload continues to increase and funding is reduced, this could compromise the quality of investigations and supervision being provided by Pretrial Services.

(e) U.S. Marshals Service: Additional resources will be required to transport pre-trial detainees, and other matters related to judicial and court security.

(f) Magistrate Judges: The District will require either new authorized Magistrate Judge positions or the recall of Magistrate Judges, or likely both.

E.  *Conclusion*

Although the District of Arizona and the Ninth Circuit Judicial Council are exploring every available alternative to alleviate the caseload congestion, the most cost-effective and reasonable long-term solution is the swift enactment of legislation creating additional judgeships for the district, perhaps as a stand-alone bill rather than as part of a larger judgeship bill. In addition, it is hoped that the President and the Senate expedite the nomination and confirmation process for the three existing judicial vacancies in the district and any additional new judgeships created. Finally, budget cuts and/or furloughs should not be considered for the District of Arizona's support staff.

Submitted by the Judicial Council
of the Ninth Circuit:

Alex Kozinski, Chief Circuit Judge
Procter Hug, Jr., Circuit Judge
Sidney R. Thomas, Circuit Judge
Raymond C. Fisher, Circuit Judge
Ronald M. Gould, Circuit Judge
Johnnie B. Rawlinson, Circuit Judge
Audrey B. Collins, Chief District Judge
Roger L. Hunt, Chief District Judge
James Ware, Chief District Judge
Stephen M. McNamee, District Judge
Robert H. Whaley, District Judge